**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0771-22

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TATAREUS L. JOHNSON,

      Defendant-Appellant.

_____

Argued April 29, 2024 – Decided May 9, 2024

Before Judges Mawla, Chase, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 21-03-0231.

Leon Grauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Leon Grauer, of counsel and on the brief).

Tiffany M. Russo, Assistant Prosecutor, argued the cause for respondent (Robert J. Carroll, Morris County Prosecutor, attorney; Tiffany M. Russo, of counsel and on the brief).

PER CURIAM

Defendant Tatareus L. Johnson appeals from the trial court's denial of his motion to suppress. We affirm.

I.

On July 8, 2020, between 7:00 p.m. and 8:00 p.m., Trooper Craig Kobovitch initiated a traffic stop of a white SUV on the eastbound lanes of Interstate Route 80 near Parsippany-Troy Hills. Trooper Kobovitch observed the SUV with what was characterized as an "unreadable or illegible temporary Ohio registration tag." As Trooper Kobovitch explained, the temporary tag was made of paper, and because of turbulence and wind, the paper tag curled up onto itself. A review of the dashcam footage reflects the left one-third folding over the middle one-third of the tag, making a portion of the tag numbers unreadable. The first few digits were not able to be deciphered without physically holding down the flapping section.

There were four persons in the SUV with defendant sitting in a rear passenger seat. Trooper Kobovitch testified he approached the vehicle, asked the driver to roll down his window and immediately detected the odors of both raw and burnt marijuana. After informing the driver of the reason for the stop and obtaining the requested information from the occupants, Trooper Kobovitch walked back to his troop car, and as he passed the rear of the SUV, he smoothed

out the registration sticker on the temporary tag so he was able to fully read it. The Trooper ran the driver's information through his troop car's computer database to ensure the vehicle was properly registered. Trooper Kobovitch then informed dispatch he smelled marijuana in the SUV and advised he intended to remove all occupants from the vehicle.[1]

The Trooper exited the troop car, approached the SUV, instructed the driver to shut the vehicle off, and asked all four occupants whether they were medical marijuana patients. When each occupant responded in the negative, Trooper Kobovitch removed them from the vehicle, searched each of them incident to arrest, read each of them their Miranda[2] rights, and questioned each of them. Trooper Kobovitch then searched the vehicle where he located two separate amounts of marijuana; two amounts of money totaling approximately $10,000 and $15,000; a handgun; and a loaded magazine.

Trooper Kobovitch testified that when he searched defendant, he did not discover any contraband on his person, but did discover a large sum of money.

---

[1] The facts giving rise to this case predate the Legislature's 2021 passage of the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, N.J.S.A. 24:61-31 to -56, which specifically eliminated the odor or possession of marijuana in amounts for personal use as a basis for reasonable articulable suspicion of a crime.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0771-22

Following the search, Trooper Kobovitch questioned defendant on whether anything else might be in the vehicle, including controlled dangerous substances or weapons, to which defendant denied having any knowledge of such information. The Trooper asked defendant if he had any explanation for the large sum of money on his person, to which defendant responded he planned to use the money to purchase his girlfriend an engagement ring in New York City.

Trooper Kobovitch testified the other occupants provided conflicting reasons for traveling to New York City, including to attend a bachelor party and to celebrate an anniversary. He found the explanations suspicious considering their conflicting nature and the weapon, contraband, and large sums of cash uncovered during the search of the SUV.

Under Indictment No. 21-03-00231, defendant was charged with one count of third-degree financial facilitation of criminal activity, N.J.S.A. 2C:25(a). Defendant was not indicted in connection with any of the contraband found during the stop. Defendant moved to suppress, challenging the motor vehicle stop. Defendant argued Kobovitch did not have a reasonable articulable suspicion to initiate the stop; therefore, the subsequent search and seizure was unlawful.

A-0771-22

The motion court jointly heard defendant's motion, along with his co-defendants' motions to suppress evidence, over four intermittent days. After testimony and argument, the court issued an oral decision denying defendants' motions. Thereafter, defendant entered into a plea agreement whereby he pleaded guilty to an amended count of fourth-degree hindering in the apprehension of another, N.J.S.A. 2C:29-3(a)(7). In exchange, the State agreed to recommend a sentence of time served of 120 days with no probation. During his allocution, defendant stated he provided false answers to Trooper Kobovitch regarding the marijuana odor in the SUV to protect the other occupants of the vehicle from being arrested. Defendant further stated he provided Trooper Kobovitch with false answers regarding his intended destination to protect the other occupants from being arrested. Defendant was sentenced in accordance with the plea agreement.

On appeal, defendant argues:

> POINT ONE: THE MOTOR VEHICLE STOP AND SEIZURE OF DEFENDANT WERE CONDUCTED WITHOUT REASONABLE AND ARTICULABLE SUSPICION BECAUSE THE PAPER REGISTRATION WAS PROPERLY AFFIXED TO THE VEHICLE AND DID NOT OTHERWISE VIOLATE THE PROVISIONS OF N.J.S.A. 39:3-33.

## II.

The scope of review of a decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021); State v. Nelson, 237 N.J. 540, 551 (2019); State v. Boone, 232 N.J. 417, 425-26 (2017); State v. Robinson, 200 N.J. 1, 15 (2009). "Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). We give deference to those factual findings in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Our deference includes the trial court's findings based on video recording or documentary evidence. See S.S., 229 N.J. at 374-81 (clarifying the deferential and limited scope of appellate review of factual findings based on video evidence and explaining "deference to a trial court's factfindings . . . best advances the interests of justice . . . .").

The reviewing court "ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022)

6

(quoting State v. Gamble, 218 N.J. 412, 425 (2014)).  However, legal conclusions to be drawn from those facts are reviewed de novo.  State v. Radel, 249 N.J. 469, 493 (2022); State v. Hubbard, 222 N.J. 249, 263 (2015).

"The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures."  State v. Smart, 253 N.J. 156, 164-65 (2023) (quoting State v. Nyema, 249 N.J. 509, 527 (2022)).  "A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions."  State v. Dunbar, 229 N.J. 521, 532 (2017).  It is well-established, "[t]o justify a stop, an 'officer must have a reasonable and articulable suspicion that the driver . . . is committing a motor-vehicle violation' or some other offense."  State v. Carter, 247 N.J. 488, 524 (2021) (quoting State v. Scriven, 226 N.J. 20, 33-34 (2016)); see also State v. Bernokeits, 423 N.J. Super. 365, 370 (App. Div. 2011) ("A motor vehicular violation, no matter how minor, justifies a stop . . . .").

"To establish reasonable suspicion, 'the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the suspicion."  State v. Pitcher, 379 N.J. Super. 308, 315 (App. Div. 2005) (quoting State v. Pineiro, 181 N.J. 13, 21 (2004)).

To determine whether reasonable suspicion existed, "a court must consider 'the totality of the circumstances—the whole picture'" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). This analysis also considers police officers' "background and training," including their ability to "make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

The State bears the burden of proving by a preponderance of the evidence that a motor vehicle stop is supported by a reasonable and articulable suspicion the driver is committing a motor vehicle violation. See State v. Atwood, 232 N.J. 433, 446 (2018). Further, "[t]he State need not prove that the suspected motor vehicle violation has in fact occurred." State v. Barrow, 408 N.J. Super. 509, 518 (App. Div. 2009) (citing State v. Locurto, 157 N.J. 463, 470 (1999)). Rather, "[c]onstitutional precedent requires only reasonableness on the part of the police, not legal perfection. Therefore, the State need prove only that the police lawfully stopped the car, not that it could convict the driver of the motor-vehicle offense." State v. Williamson, 138 N.J. 302, 304 (1994); see also State v. Sutherland, 231 N.J. 429, 439 (2011).

A-0771-22

Defendant posits because the Ohio temporary tag was affixed properly, even if it was obstructed and only the last few characters of the plate were visible, the motion court erroneously found there was reasonable suspicion to stop the motor vehicle. He further argues the court interpreted N.J.S.A. 39:3-33 beyond its plain meaning and the court's statutory interpretation goes beyond the Legislature's intent in enacting it.

The motion court found Trooper Kobovitch's testimony credible and corroborated by both the troop car's dashboard camera footage and the physical evidence presented. The court found it "beyond question that there was a flimsy paper tag on the back of the vehicle." The court further noted it believed the temporary paper tag, rolled up, provided the articulable basis for Trooper Kobovitch to conduct the traffic stop. The trial court explained there is no precedent that would allow it to find the government of another state to have issued something that did not fulfill the role for which it was intended. The court reiterated Trooper Kobovitch's inability to read the temporary tag served as an appropriate legal basis for pulling over the SUV.

At the time of the stop, N.J.S.A. 39:3-33, in pertinent part, read:

> The owner of an automobile which is driven on the public highways of this State shall display not less than [twelve] inches nor more than [forty-eight] inches from the ground in a horizontal position, <u>and in such a way</u>

as to not swing, an identification mark or marks to be furnished by the division; provided, that if two marks are issued they shall be displayed on the front and rear of the vehicle; and provided, further, that if only one mark is issued it shall be displayed on the rear of the vehicle . . . .

The identification mark or marks shall contain the number of the registration certificate of the vehicle and shall be of such design and material as prescribed pursuant to section 2 of P.L.1989, c. 202 (C. 39:3-33.9). All identification marks shall be kept clear and distinct and free from grease, dust, or other blurring matter, so as to be plainly visible at all times of the day and night.

No person shall drive a motor vehicle which has a license plate frame or identification marker holder that conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate or any part of any insert which the director, as hereinafter provided, issues to be inserted in and attached to that registration plate . . . . or marker.

[(Emphases added).][3]

Defendant argues the waving registration did not swing, the rolled-up transparent sticker on the paper registration was not a foreign blurring matter, and the third section of the statute prohibits only obscuring of any marking by a

---

[3] Effective July 1, 2023, N.J.S.A. 39:3-33 has been amended to clarify that where the State, registration number, or expiration date of a temporary registration certificate or plate "is concealed or otherwise obscured in such a way that the information to which this provision applies can still reasonably be identified or discerned[,]" the section is not violated.

"license plate frame or identification marker holder." Defendant maintains reasonable suspicion did not apply because the statute does not proscribe obscuring by any other means or material, and therefore any impediment caused by a curled registration sticker is neither contemplated nor prohibited under this section.

The paramount goal of "statutory interpretation is to 'determine and give effect to the Legislature's intent.'" State v. A.M., 252 N.J. 432, 450 (2023) (quoting State v. Lopez-Carrera, 245 N.J. 596, 612 (2021)). To achieve that goal, we "begin with the language of [the] statute, 'which is typically the best indicator of intent.'" Ibid. (quoting State v. McCray, 243 N.J. 196, 208 (2020)). We read the "[w]ords and phrases in a statute . . . not . . . in isolation" but "in context, along 'with related provisions[,] . . . to give sense to the legislation as a whole.'" A.M. 252 N.J.at 451 (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "If a statute's plain language is clear, we apply that plain meaning and end our inquiry." Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 489 (2019). As it is clear that visibility is the ultimate objective of the statute, we see no basis to disturb the court's conclusion.

Trooper Kobovitch determined the SUV could be pulled over after observing the temporary tag was rolled up and unreadable. All that was required

11

of Trooper Kobovitch to conduct an appropriate traffic stop was his reasonable suspicion that a statute was being violated. His reasonable suspicion was justified based on the registration flapping or swinging on itself so that it was not clearly visible as the rolled-up sticker was blurring the identification of two-thirds of the registration numbers.

To the extent we have not addressed any remaining contentions, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION